UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

GOLD COAST COMMODITIES, INC.                              PLAINTIFF

VS.                              CIVIL ACTION NO. 3:22-cv-207-TSL-MTP

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA                                       DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the motion of defendant
Travelers Casualty and Surety Company of America (Travelers) for
partial summary judgment regarding the duty to defend in relation
to the claim of plaintiff Gold Coast Commodities, Inc. (Gold
Coast) for breach of contract, and on motions by Gold Coast for
partial judgment on the pleadings as to its claim for a
declaratory judgment that Travelers has breached and/or is in
breach of its duty to defend Gold Coast and its principals against
lawsuits filed against them by the City of Jackson, Mississippi
and the City of Brandon, Mississippi.  Briefing on the motions is
complete, and the court, having reviewed the parties' memoranda of
authorities on the motions, concludes that Travelers' motion
should be granted and the motions of Gold Coast should be denied.

<u>Background and Complaint</u>

This case involves a dispute about insurance coverage under a
Wrap+, Private Company Directors and Officers Liability Policy

1

issued by Travelers to Gold Coast with a policy period beginning June 25, 2016 and renewed through June 25, 2019.  Thomas Douglas and Robert Douglas, co-owners and principals of Gold Coast, were insureds under the terms of the policy.  In July 2018, the City of Brandon filed suit in the Circuit Court of Rankin County against Gold Coast, Thomas Douglas and Robert Douglas seeking, *inter alia*, damages resulting from Gold Coast's alleged illegal discharge/dumping of industrial waste into the Brandon sewer system.  In June 2021, the City of Jackson filed suit in the Circuit Court of Hinds County against Gold Coast, Thomas Douglas and Robert Douglas, similarly charging that Gold Coast's alleged illegal discharge of waste had resulted in substantial damage to Jackson's sewer system.

By letters dated July 19, 2018 and June 25, 2021, respectively, Travelers denied Gulf Coast's demands for a defense and indemnity relating to the City of Brandon's and City of Jackson's lawsuits on the basis of several policy exclusions, including Exclusions A.1, which excludes coverage for loss from any claim for damage, destruction or loss of use of any tangible property; A.3, the policy's pollution exclusion; A.4, which relatedly excludes coverage for loss based on events or acts underlying or alleged in any prior or pending proceeding; and A.5,

2

which excludes loss for events or circumstances that an executive officer reasonably knew prior to August 5, 2016 would have been regarded as the basis for a claim.  Travelers denied the City of Jackson's claim for the further reason that claim was not timely, having been filed approximately two years after the claims-made policy had expired.

Gold Coast filed the present action on March 30, 2022, seeking a declaratory judgment that Travelers is obligated under the policy to defend against the complaint filed by the City of Jackson, and to pay any damages awarded to the City of Jackson. It filed an amended complaint on June 14, 2022, adding a claim for a declaratory judgment that Travelers is obligated under the policy to defend against the City of Brandon's lawsuit and to indemnify it for any damages awarded the City of Brandon.[1]

On the present motions, Travelers seeks partial summary judgment that it has no duty to defend in relation to the lawsuits filed against Gold Coast, Thomas Douglas and Robert Douglas by the Cities of Brandon and Jackson; Gold Coast, in turn, has moved for judgment on the pleadings on its claim for a declaratory judgment

---

1    Gold Coast advises in its briefing on the present motions that the Brandon lawsuit proceeded to trial on July 18, 2022, and on the second day of trial, was settled and the case dismissed with prejudice.

that Travelers is obligated under the terms of the policy to defend these actions.[2]

An Insurer's Duty to Defend

As this case is before the court on the basis of diversity jurisdiction, the court applies Mississippi law.  See American Intern. Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254, 260 (5th Cir. 2003) (in cases arising under diversity jurisdiction, substantive law of forum state applies) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), and Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985, 988 (5th Cir. 1992)).  To determine state law, the court looks to the final decisions of the state's highest court; and "in the absence of a final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case." Id. (citing Transcon. Gas Pipe Line Corp., 953 F.2d at 988).

Under Mississippi law, "an insurer's duties to defend and indemnify its insured are distinct and separate duties requiring

---

2    Pursuant to the case management order entered June 30, issues of Travelers' alleged duty to defend and to indemnify were bifurcated, and the parties were given an October 1, 2022 deadline to file dispositive motions relating to the duty to defend.

the use of different standards." <u>Estate of Bradley ex rel. Sample</u> <u>v. Royal Surplus Lines Ins. Co., Inc.</u>, 647 F.3d 524, 529 (5th Cir. 2011) (citing <u>Titan Indem. Co. v. Pope</u>, 876 So.2d 1096, 1101-02 (Miss. Ct. App. 2004)). Regarding the duty to defend, Mississippi has adopted the allegations of the complaint rule, by which "the determination of whether an insurance company has a duty to defend depends upon the language of the policy as compared to the allegations of the complaint in the underlying action." <u>Minnesota</u> <u>Life Ins. Co. v. Columbia Cas. Co.</u>, 164 So. 3d 954, 970 (Miss. 2014) (citations omitted); <u>Travelers Indem. Co. v. Mitchell</u>, 925 F.3d 236, 240 (5th Cir. 2019) (under Mississippi's "so-called eight corners rule," question whether insurer has duty to defend insured against claim "is resolved by comparing the four corners of the policy with the four corners of the complaint) (citation omitted). "An insurance company's duty to defend its insured is triggered when it becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy. However, no duty to defend arises when the claims fall outside the policy's coverage." <u>Baker Donelson</u> <u>Bearman & Caldwell, P.C. v. Muirhead</u>, 920 So. 2d 440, 451 (Miss. 2006). The question to be decided, therefore, is whether the allegations of the underlying complaints against Gold Coast and

its principals state a claim that is within or arguably within the coverage of the subject policies.  If they do, then Travelers has a duty to defend (though not necessarily to indemnity); if they do not, then there is no duty to defend and Travelers is entitled to summary judgment.

Under Mississippi law, "[t]he interpretation of an insurance policy is a question of law, not one of fact," Noxubee Cnty. Sch. Dist. v. United Nat'l Ins. Co., 883 So. 2d 1159, 1165 (Miss. 2004); and, because an insurer's duty to defend its insured in an underlying action rests on the factual allegations in the complaint and the language of its policy, the determination whether there is a duty to defend is addressed as a matter of law, American Intern. Specialty Lines Ins. Co., 352 F.3d at 260.  In its motion, Travelers asserts as the bases for partial summary judgment all of the grounds for denial set forth in its July 2018 and June 2021 denial letters, detailed supra p. 2-3, and argues, additionally, that it has no duty to defend for the further reasons that its policy provides only excess coverage, so that any duty to defend lies with one or more of Gold Coast's primary insurers, and that Gold Coast's claims relating to the Brandon lawsuit, having been brought more than three years after it denied Brandon's claim for coverage, are barred by the applicable statute

6

of limitations, Miss. Code. Ann. § 15-1-49.  Gold Coast disputes

all Travelers' arguments and maintains that its lawsuit was timely

filed and that some or all of the claims in the underlying

lawsuits are covered, and are not unambiguously excluded from

coverage, and that Travelers therefore has a duty to defend as a

matter of law.  For reasons that follow, the court concludes that

all the claims advanced in the underlying lawsuits are clearly and

unambiguously excluded from coverage based on the policy's

pollution exclusion, and that Travelers is therefore entitled to

summary judgment.  The court, therefore, finds it unnecessary to

address the parties' remaining arguments.

       The Pollution Exclusion

       To reiterate, to determine whether Travelers has a duty to

defend, the court must compare the language of the policy to the

allegations of the complaints in the underlying actions.  The

language of Exclusion A.3 of Travelers' policy states that

Travelers will not be liable for loss for any claim:

       a. based upon or arising out of the actual, alleged or
       threatened discharge, dispersal, seepage, migration,
       release or escape of any Pollutant;

       b. based upon or arising out of any request, demand,
       order, or statutory or regulatory requirement that any
       Insured or others test for, monitor, clean up, remove,
       contain, treat, detoxify, or neutralize, or in any way
       respond to, or assess the effects of, any Pollutant; or

7

> c. brought by or on behalf of any governmental authority
> because of testing for, monitoring, cleaning up,
> removing, containing, treating, detoxifying or
> neutralizing, or in any way responding to, or assessing
> the effects of, any Pollutant.

The policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed."

Turning to the complaints, Gold Coast, as described in the City of Brandon's complaint,

> produces customized animal feed products using
> acidulated oil seed soapstocks, UCO, poultry fat, palm
> fatty acids and oils, and more.  [The company produces]
> biodiesel and other items tangentially related to its
> central business operation.  As part of its production
> process, Gold Coast adds sulfuric acid to used oil and
> soapstock.  Effluent from this process is then mixed
> with caustic (usually sodium hydroxise) and moved to
> wastewater disposal tanks to await disposal.  Gold
> Coast's effluent has to be kept at extremely high
> temperatures because, at normal temperatures, it would
> be too viscous to flow.
>
> Gold Coast's business operation, by its nature, produces
> at least 6,000 gallons of wastewater per week.  The
> wastewater … is extremely acidic (i.e., it has a very
> low pH level), extremely hot, and inappropriate for
> dumping into a public sewer.

The complaint goes on to allege that for years, Gold Coast engaged in recklessly, wantonly, intentionally and illegally "dumping significant amounts of high-temperature, corrosive, low-pH wastewater into the City's sewer system" on a consistent basis.

8

This wastewater contained "high levels of arsenic, barium, cadmium, chromium, lead, mercury, sodium, and sulfate," and "was so acidic that it significantly affected the overall pH of *all* the wastewater in the City's system downstream from its discharge point."  The City complained to the Mississippi Department of Environmental Quality, which investigated and determined that Gold Coast's discharge of untreated wastewater violated numerous state laws relating to pollution of waters.  Consistent with this finding, Brandon's complaint recited, among other things, that Gold Coast's dumping violated several provisions of City ordinances relating to the discharge of waste/wastewater, as well as state laws which prohibit placement of wastes in a location where they are likely to cause pollution of waters of the state, see Miss. Code Ann. § 49-17-29(2)(a), and which prohibit the introduction of pollutants into a publicly-owned sewage treatment system without proper pretreatment, see Miss. Code Ann. § 49-17-43(5)(b) and 11 Miss. Admin. Code Part 6, Ch. 1, Rule 1.1.1.B(2).  According to Brandon's complaint, Gold Coast's illegal dumping of its corrosive wastewater caused severe damage to the City's sewer system (i.e., corrosion to the system's reinforced concrete pipes and lined ductile iron pipes), as a result of which the City has been and will be forced to spend significant funds to repair pipe

failures and restore the integrity of its sewer system.  Based on these allegations, the City of Brandon demanded compensatory and punitive damages, and an injunction prohibiting Gold Coast from further "disposing of improper waste into the City's sewer system."

The City of Jackson's complaint similarly alleges that Gold Coast engaged in "illegal dumping of millions of gallons of highly-corrosive, untreated waste into the City's sewer system, damaging the City's infrastructure and threatening the public health and safety."  Referencing the Brandon complaint, the Jackson complaint reiterates that laboratory testing of the sewer system downstream from the Gold Coast facility revealed "high levels of various chemicals … including arsenic, barium, cadmium, chromium, lead, mercury, and sulfate."  The complaint demands damages exceeding $15 million "arising from the Defendants' illegal and reckless disposal of industrial waste, including the cost of repairing and replacing damaged areas of the City's sewer lines and wastewater treatment facilities, … environmental remediation and investigation costs, lost revenue from sewer usage fees and treatment fees for industrial waste that the Defendants should have presented for proper treatment at the City's permitted facilities…."

10

In its own complaint in this case, and in its motions for partial judgment on the pleadings, Gold Coast purports to acknowledge that the complaints filed against it by Jackson and Brandon "seek to recover for damages for negligence and resulting from a discharge, dispersal, seepage, migration, release, escape, presence or movement of 'pollutants' as that term is defined in the Policy." Despite this, it argues that because the definition of "pollutants" in Travelers' policy is identical to the definition of "pollutants" that the Mississippi Supreme Court recently found to be ambiguous in Omega Protein, Inc. v. Evanston Insurance Company, 336 So.3d 128 (Miss. 2022), it follows that the exclusion cannot defeat its claim of coverage. See J & W Foods Corp. v. State Farm Mut. Auto. Ins. Co., 723 So. 2d 550, 552 (Miss. 1998) ("If this Court finds an insurance policy ambiguous, we must necessarily find in favor of coverage.").

In Omega, one worker was killed and several others were injured when a storage tank at the Omega Protein plant exploded. Omega sought coverage for lawsuits seeking damages for the injuries, including the death, caused by the explosion. The lawsuits alleged that the explosion was caused by the ignition of explosive gases inside the storage tank, which was used for the temporary storage of stickwater, an organic liquid composed of

11

water, fish oil and solids that is a byproduct of the fish meal
and fish oil production process.  As a result of the decomposition
of organic matter, the stickwater in the tank had produced
methanethiol, hydrogen sulfide, and methane, all extremely
flammable gases; the explosion occurred while workers, including
the decedent, were welding and grinding on the tank.

    The insurer argued that the gases in the tank were
pollutants and that coverage for the wrongful death claim against
its insured was thus excluded based on the policy's pollution
exclusion, which excluded claims for loss "arising out of or
contributed to in any way by the actual, alleged or threatened
discharge, dispersal, release, migration, escape, or seepage of
pollutants."  The policy, like Travelers' policy, defined
"pollutants" as "any solid, liquid, gaseous, or thermal irritant
or contaminant including smoke, vapor, soot, fumes, acids,
alkalis, chemicals, and waste.  Waste includes material, to be
recycled, reconditioned, reclaimed or disposed of."  Id.  The
insured argued that the gases in the tank were not irritants or
contaminants since they were properly contained within the tank
and were not contacting, contaminating, or irritating anything.
Id.

The court ultimately determined that the pollution exclusion was susceptible to more than one reasonable interpretation and was therefore ambiguous and had to be construed in favor of coverage. Id. at 132. In coming to this conclusion, the court first observed that while the policy's definition of "pollutants" included "irritant or contaminant," the policy did not define "irritant or contaminant." Id. at 131. Hydrogen sulfide and methanethiol were defined on the CDC website as irritants, the court noted, but both "require contact with mucous membranes or inhalation to become an irritant." Id. (citations omitted). After then looking to the dictionary definitions of "irritant," which defined the term as an "irritant substance, body or agency; a poison, etc. which produces irritation; and anything that stimulates an organ to its characteristic vital action," and "contaminant," which was defined as "to render impure by contact or mixture; to corrupt, defile, pollute, sully, taint, [or] infect," id. (internal quotation marks and citation omitted), the court wrote:

> The words "irritant" and "contaminant" are subject to
> more than one meaning under the pollution exclusion. On
> one hand a substance can be an irritant or contaminant
> at its core and by its very nature. That substance is
> an irritant or a contaminant no matter where it is, how
> it is contained, or whether it is in contact with
> something actively irritating or contaminating it. On
> the other hand, pursuant to the above-cited definitions,

13

> a substance is not necessarily an irritant or
> contaminant until it comes into contact with something
> and is actively irritating or contaminating it.  For
> example, crude oil inside a large tanker is a
> contaminant by its very nature.  Though it is contained
> inside the tanker, were it to come into contact with the
> water or wildlife, it would contaminate them
> immediately.  The potential a substance has to
> contaminate makes the substance a contaminant by its
> nature, no matter where it is located.  It can also be
> said that the same crude oil under the same set of facts
> is not a contaminant because it is located inside an
> inert container within the ship and is not in contact
> with anything.  In that context, that crude oil is not a
> contaminant because it is not actively contaminating
> something.

Id. at 132.

Gold Coast's position that the pollution exclusion in the Travelers policy does not exclude coverage for the underlying lawsuits is based solely on its interpretation of Omega as holding that the policy definition of "pollutant" at issue there, and here, is ambiguous "as a matter of law."  Gold Coast insists that the court in Omega found the pollution exclusion to be ambiguous "as a matter of law," without regard to context in which the specific coverage issue arose.  It claims, therefore, that based on Omega, this pollution exclusion is ambiguous in all possible contexts, without regard to the nature of the alleged "contaminant" or "irritant" involved or the mode, manner or type of injury at issue in the underlying claim; and further, since ambiguities must always be construed in favor of coverage, then

14

there is no circumstance in which coverage can be excluded under this pollution exclusion.  In other words, the exclusion is a nullity.  This court does not share Gold Coast's view of the substance or import of the court's opinion in Omega.

As the Mississippi Supreme Court has stated in numerous cases, insurance policies in this state are considered contracts that are to be enforced according to their provisions.  Hankins v. Maryland Cas. Company/Zurich American Ins. Co., 101 So. 3d 645, 653 (Miss. 2012).

> When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain. Thus, insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.

Id. (quoting Corban v. United Servs. Auto. Ass'n, 20 So. 3d 601, 609 (Miss. 2009)).  "Accordingly, 'the appropriate analysis should ... be driven by ... the policy language.  The policy either affords coverage or not, based upon application of the policy language to the facts presented.'"  Id. (quoting Architex Ass'n, Inc. v. Scottsdale Ins. Co., 27 So. 3d 1148, 1156 (Miss. 2010)).  That court's analysis is governed by governed by general principles of contract construction, including the principles that

15

>     if a contract is clear and unambiguous, then it must be
>     interpreted as written.  A policy must be considered as
>     a whole, with all relevant clauses together.  If a
>     contract contains ambiguous or unclear language, then
>     ambiguities must be resolved in favor of the non-
>     drafting party.  Ambiguities exist when a policy can be
>     logically interpreted in two or more ways, where one
>     logical interpretation provides for coverage.  However,
>     ambiguities do not exist simply because two parties
>     disagree over the interpretation of a policy.
>     Exclusions and limitations on coverage are also
>     construed in favor of the insured.  Language in
>     exclusionary clauses must be "clear and unmistakable,"
>     as those clauses are strictly interpreted.
>     Nevertheless, "a court must refrain from altering or
>     changing a policy where terms are unambiguous, despite
>     resulting hardship on the insured."

Id. at 653-64 (quoting Architex Ass'n, 27 So. 3d at 1157).

The determination whether a policy provision is ambiguous is not made in a vacuum.  Rather, the court determines whether the language of the provision is ambiguous "based upon application of the policy language to the facts presented."  Id. at 653.  It does not necessarily follow from the fact that policy language is ambiguous in one context that it is ambiguous in all contexts. Indeed, courts have long recognized that "[a] policy may be unambiguous, as applied to one set of facts, but may take on characteristics of ambiguity in connection with other facts." Burton v. State Farm Fire & Cas. Co., 533 F.2d 177, 179 (5th Cir. 1976) (holding that policy provision which had previously been found ambiguous as applied to the facts of prior case and thus

16

construed against the insurer, was not ambiguous as applied to different set of facts in subsequent case); Progressive Gulf Ins. Co. v. We Care Day Care Center, Inc., 953 So. 2d 250, 253 (Miss. App. 2006) (affirming trial court's finding that exclusion "was ambiguous as applied to the facts of this case"); see also Restatement of the Law of Liability Ins. § 4 Comment a (2019) ("An ambiguous policy term is a term that has at least two interpretations to which the language of the term is reasonably susceptible when applied to the facts of the claim in question.  … The concept of ambiguity in insurance law can include what is sometimes called vagueness: a lack of clarity in application that does not easily reduce to multiple competing interpretations.  A term that has a plain meaning when applied to one claim may not have a plain meaning when applied to another claim.").  Thus, for example, a pollution exclusion which would unambiguously exclude coverage for a polluting event caused by the insured may be ambiguous as applied to a polluting event caused by a third party. See North Amer. Specialty Ins. Co. v. Georgia Gulf Corp., 99 F. Supp. 3d 726, 730-31 (M.D. La. 2000) (pollution exclusion which did not specify whether it applied only to acts of insured but also to acts of third parties held ambiguous "[a]s applied to the facts of this case," which involved discharge by third party).

17

The opinion in <u>Omega</u> could be more clear in several respects, but this court, unlike Gold Coast, finds that the opinion is most reasonably read, not as holding that the subject pollution exclusion is ambiguous "as a matter of law" in all contexts, but as holding that the exclusion was ambiguous as applied to the specific facts of the claims asserted against the insured in that case. The <u>Omega</u> court acknowledged that a substance which is not a contaminant in one setting, e.g., crude oil when contained inside a tanker, is a contaminant in another setting, e.g., when that crude oil comes into contact with the water or wildlife. The crude oil, the court observed, "is not necessarily an irritant or contaminant *until it comes into contact with something and is actively irritating or contaminating it*." <u>Id.</u> (emphasis added). The court's opinion further indicated both that prior to the explosion, the gases emitted from the stickwater, like the crude oil in the first example, "were properly contained within the tank," and that the underlying lawsuits against the insured sought damages for injuries that were not caused by contact with hydrogen sulfide, methane or methanethiol but rather *by the explosion*.[3]

---

3    The court's statements that "*the explosion* killed one man and seriously injured several others," and that one worker was killed and others were injured "*[a]s a result of the explosion*," <u>Omega Protein, Inc. v. Evanston Insurance Company</u>, 336 So.3d 128 (Miss. 2022) (emphasis added), is confirmed by a review of the complaints

Thus, as applied to the facts presented, the court found the exclusion was ambiguous:  there was a reasonable interpretation under which the gases were not "irritants" or "contaminants."[4]

———————————

filed against Omega relating to the explosion.  The workers who sued, and the wrongful death representatives of the worker who died, all alleged that they suffered personal injuries due to the "force of the explosion."  See Taylor v. Omega Protein, Inc., Civ. Action No. 1:15-cv-00286, Dkt. No. 1, filed 09/02/15 (S.D. Miss.) (alleging that Taylor died from "massive injuries to head, neck, trunk and extremities" due to "blunt force impact" caused when "the force of the explosion … catapulted [their decedent's] body 100 feet to the southeast, where he died after landing on the unforgiving metal top of another tank…."); Walls v. Omega Protein, Inc., Civ. Action No. 1:16-cv-00176, Dkt. No. 1, filed 5/26/2016 (S.D. Miss.) (alleging that "the force of the explosion shot [his] body some 100 feet to the southwest of Tank #10," where he landed on a catwalk, and seeking damages for his personal injuries caused by "the explosion and/or impact traumas which he sustained…."); Davis v. Omega Protein, Inc., 1:16-cv-00329, Dkt. 1, filed 09/07/16 (S.D. Miss.) ("The force of the explosion blew him into some pipes located approximately 8 feet away.").  Two workers who were in close proximity to the explosion sued seeking damages for emotional distress suffered from having witnessed the explosion and related death and injuries to their co-workers.  See Gabel v. Omega Protein, Inc., Civ. Action No. 1:16-cv-00328, Dkt. No. 1, filed 4/26/18); McGill v. Omega Protein, Inc., Civ. Action No. 1:17-cv-00210, Dkt. No. 1, filed 7/27/17 (S.D. Miss).  The plaintiffs also alleged that the gases ignited within the tank, where they were contained.  None of the plaintiffs claimed to have been injured through contact with the gases that ignited and caused the explosion.

4    This court is not alone in its interpretation of Omega.  See 43 No. 6 Construction Litigation Reporter NL 7 (2022) (stating that Omega court found that "[a]s the pollution exclusion *in this context* is susceptible to more than one reasonable interpretation it must be construed in favor of coverage." (emphasis added)).

In determining whether a policy provision is ambiguous, the question for the court is not only whether the provision is susceptible to more than one reasonable interpretation, but whether it is susceptible of a reasonable interpretation under which there is coverage for the claimed loss.  Hankins, 101 So. 2d at 654 ("Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage."); Progressive Gulf Ins. Co., 953 So. 2d at 260 (exclusion is ambiguous where it has more than one reasonable meaning, "one of which is favorable to the insured").[5]  In the

---

5 One commentator has expressed that:

> The Omega opinion is itself unclear on why the court's interpretation of the pollution exclusion favors coverage.  The lack of clarity stems from the opinion's failure to explain how Taylor died and the others were injured.  If their injuries resulted solely from the force of the explosion, which was caused by the combustive nature of gases, and not from the gases' toxicity, the court's holding stands for the proposition that a toxic chemical does not qualify as an excluded pollutant when it is fully contained and functions only as a catalyst for an explosion.  However, if Taylor and the other victims inhaled the toxic hydrogen sulfide and methanethiol released by the explosion and suffered injuries as a result, neither interpretation of the pollution exclusion advanced by the court should preclude the exclusion's applicability.

43 No. 6 Construction Litigation Reporter NL 7.  In fact, this court interprets the Omega opinion as acknowledging, at least implicitly, that death and injuries were caused by the force of the explosion, which was caused by the combustive nature of the gases.

present case, there is no reasonable interpretation under which the pollution exclusion in the Travelers policy would not apply to the claims asserted in the underlying actions against Gold Coast, all of which are based on the alleged discharge or disposal of toxic industrial waste in Brandon's and Jackson's sewer systems. In this context, the pollution exclusion could not be more clear. This is precisely the type of activity to which it was intended to apply.  Thus, while the Mississippi Supreme Court found the exclusion was ambiguous on the facts presented in <u>Omega</u>, this court is convinced that the Supreme Court would find that the exclusion unambiguously excludes coverage for loss claimed by Gold Coast relating the underlying lawsuits by the Cities of Brandon and Jackson.

As the claims are excluded from coverage, it follows that Travelers has no duty to defend, and further, no duty to indemnify Gold Coast or the other insureds in relation to the underlying lawsuits brought against them by the Cities of Brandon and Jackson.  <u>See</u> <u>Isom v. Valley Forge Ins.</u>, 716 F. App'x 280, 287 (5th Cir. 2017) (citing 14 Steven Plitt et al., <u>Couch on Insurance</u> § 200:3 (3d ed. 2007)) (because the duty to defend is broader than the duty to indemnify, "there can be no duty to indemnify" where

"there is no duty to defend"). Travelers, therefore, is entitled to summary judgment on the complaint in this cause.[6]

Accordingly, it is ordered that Travelers is entitled to summary judgment and that its motion is therefore granted, and the motions of Gold Coast for partial judgment on the pleadings are denied.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 5th day of December, 2022.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

6    Travelers moved for *partial* summary judgment on Gold Coast's claim for breach of contract, but in substance, the only claim by Gold Coast is for breach of contract, or a declaratory judgment that Travelers is in breach of contract based on its denial of coverage and consequent failure and refusal to defend and denial of any indemnity obligation. Thus, since the court concludes there is no coverage, then Travelers is entitled to summary judgment. See HS Resources, Inc. v. Wingate, 327 F.3d 432, 441 (5th Cir. 2003) ("A district court may enter summary judgment sua sponte so long as the losing party has notice and an opportunity to come forward with evidence.").